O’Neall J.
The former opinion of this Court disposed of the leading question in this case; and under *339 ordinary circumstances, it would not be necessary to do more than to refer to it generally',Tor the rules by which we are governed; but at the request of counsel, the whole case was opened for re-argument, and it will he therefore necessary to present some additional reasons, why we shall adhere to the decision. Before however, we come to the main-question, it will be necessary to consider and decide the grounds taken for a new trial which admit the general rule as settled by the former decision.
1. The guilt of the prisoner, in Georgia, if anything beyond the indictment found “a true bill,” and the prisoner’s identity, was necessary, was clearly made out by proof that he killed Goodson. Every homicide at common law is prima fade murder; and the reduction of it to a less offence, after the fact of slaying is proved, generally devolves upon the prisoner. The evidence on the part of the State, may sometimes disclose facts enough to reduce the offence to manslaughter, or excusable homicide; and if so, it avails the prisoner in his de-fence. But if this does not appear from the evidence on the part of the State, it is for him to shew every matter which makes it a less, ór no offence, and if he fails, he must be adjudged guilty of murder. But it ought to be borne in mind, that it was not necessary to shew that the prisoner was guilty of murder in Georgia, in order to authorize the arrest: if he was guilty of a felony, with or without the benefit of clergy, it was all that was necessary. Manslaughter is a felony with the benefit of clergy, and it would not be contended that the evidence given of the manner of Good-son’s death, would not be amply sufficient to convict the prisoner of manslaughter. But it is said, how can : you know that homicide is an offence in Georgia? I answer, it is an offence, at common law, and in every; code of laws, ancient or modern, and it is every where ;, to be regarded as an offence, until the contrary is j shewn. If however it was necessary to have proof1 that it was contrary to the law of Georgia, the Governor’s proclamation, and the finding of the Grand Jury of the bill of indictment, establish the fact to be so. *340 How the prisoner’s actual guilt was to be proved by the record of his trial and conviction in Georgia, as his counsel contends it ought to have been, it is-difficult to conceive. To convict him in Georgia, it was necessary that he should have been arrested,, arraigned and tried, if this had taken place, it is not likely that he would have been a fugitive from justice. But he fled before arrest,, and if a conviction was necessary to his arrest out of Georgia, hi& flight was in itself, tantamount to an acquittal. For- so long as he remained out of her precincts, lie could never be arrested. But ills not necessary in any case to authorize an arrest, to shew the fact of guilt by matter of record ; it is like every other fact in pais,.to be proved by parol. If however it had been necessary to shew the prisoner’s guilt in Georgia by matter of record,, the findingoftheindictment,‘ea true bill,” by the Grand Jury, and the identity of the prisoner as. the person against whom it was found, established his guilt by-matter of record, for all the purposes of this case.. It was prima facie evidence of his. guilt, and like all other prima evidence, until rebutted it warranted the conclusion of his guilt. But 1 apprehend to justify the prisoner’s arrest, it was only necessary to prove that he voluntarily killed Goodson. This was at common law murder until the contrary appeared; and if the question was at all examinable here, it was for the Prisoner to shew his excuse or justification. I am owever satisfied that the fact of a voluntary slaying, authorized the arrest, and that matter in excuse could not be heard to destroy that rights The homicide actually committed, constitutes the authority to arrest it is a felony until matter in excuse be shewn?, it authorizes the grand jury to find a true bill, and thus put the prisoner on his trial, for life and death. Like the finding of stolen goods in the possession of one, he is legally regarded as the thief, until he accounts fluids possession r so he who of Ms own will,and not by command of law, commits a homicide, is legally guilty of murder, until he shews that it was excusable in pelf-defence, or manslaughter, by reason of auddeB *341 heat and passion from reasonable provocation given, The party arresting is supposed to act with knowledge of the law — -he is bound" therefore to shew, that the prisoner has committed the fact from which the law raises the presumption of guilt. This is what I understand by being bound to shew the prisoner’s guilt, in order to justify his arrest by a private person.. A mere suspicion that he has done the act, will not justify the arrest, the proof must shew that prima fade a legal felony was-committed, and that the prisoner was the perpetrator. The prisoner’s excuse, although it might shield him from condemnation, does not enter into the question.
VoL'8-19^
I however go farther than is maintained in the former opinion, and hold, that on the trial of the prisoner for the murder of Berry, we have nothing to do with the fact or manner of the homicide committed by him in Georgia. The only legitimate inquiry is — was the prisoner at the time the arrest was attempted to be made, a fugitive from the justice of the State of Georgia, whom the Governor of this State, on a copy of the indictment found, or an affidavit charging him with murder, and a demand from the Governor of Georgia, would have been bound to have caused to be arrested and delivered to any agent of the State of Georgia, who might be appointed to receive him? If he was,5 I hold, and I hope to be able to make that good in another part of this opinion, that any Justice of the| peace of this State, might on information to hitrqliave; issued his warrant for his arrest, and, committed him to any of the gaols of this State for safe keeping, until' the Governor of Georgia eouldbe notified of his arrest,; and demand him: and that a private citizen assuming upon himself the responsibility of shewing that he was a fugitive from justice, charged with felony in Georgia, would have the right to arrest him, and take him before a Justice of the peace for examination, and-commitment to the gaol of the district of this. State in which he was arrested.
2. The second and third grounds, may be considered, together. The instruction of the presiding Judge to> *342 ^110 jury, “that if the prisoner was guilty of murder ill Georgia, then under the circumstances of this case, he was guilty of murder here,” was certainly putting issue of the prisoner’s case upon the most favorable footing. For his actual guilt there, was not essential to his conviction for the murder of Berry. Was a voluntary homicide there committed? and was the prisoner the perpetrator? were the questions necessary to the validity of the arrest, according to the former opinion in this case. If however the prisoner was the slayer of Goodson without excuse, his certain guilt in Georgia, if established to the satisfaction of the jury, could not injure the prisoner, when less certainty in the degree of his guilt would have been sufficient. The error of the Judge was in favor of the prisoner; it put the chance of his acquittal upon the question, whether he was guilty of murder in Georgia. This was increasing his chances of escape from conviction, instead of diminishing them. It is true that his guilt in Georgia did not necessarily make him guilty here — it only authorized and made the attempt to arrest him lawful. If however this lawful power was abused by attempting to kill, instead of arresting the prisoner, the abuse of the-power might have rendered it unlawful. From the report of the presiding Judge, it would seem that the prisoner’s case was submitted to the jury, under instructions corresponding with the opinion of the Court of Appeals, and if so, he has no cause of complaint in this respect.
The prisoner’s guilt in Georgia, was Í think fully proved by the witness Wheeler. The witness and Goodson were two of a party who were in pursuit of the prisoner and his brother, for some offence; they discovered them in the woods, and ordered them to stand — the brother instantly ran, and the prisoner shot Goodson dead. There was nothing in this transaction which made it less than murder. There was no force imposed on the prisoner, not even the touching of his person, or an attempt to lay hands on him; there was no offer or threat to kill, or do personal violence to him: he was requested to stand, and instead *343 of doing as any honest man would have done, standing still and asking ‘"Why he was required to stand?” he shot, and killed Gfoodson.' If under these circumstances, the homicide is not to be adjudged murder, it will be difficult hereafter to apply to any case Mr. Justice Foster’s description of the distinguishing characteristic of murder, “a heart totally devoid of social duty, and fatally bent on mischief.”
3. The fourth ground deserves no comment. The opinion of the Court of Appeals, was the law of the case; and the jury had the right (if they chose to exercise it) to refer to it, as the law by which their verdict was to be found.
4. The prisoner’s fifth ground, complains that the presiding Judge instructed the jury, that unless the prisoner demanded from Col. Martin and his party, their authority to arrest, or the cause why they did attempt to arrest, they were not bound to give him any information on the subject. From the report of the presiding Judge; I should suppose thathe had instructed the jury, in conformity to the prisoner’s wishes; for he has furnished us with a most elaborate argument in favor of the ground.
I am satisfied that under the circumstances attending the attempt to arrest, that no information of the cause of the arrest was necessary to be communicated to the prisoner. It is most obvious that he knew why it was that Col. Martin told liim that they were to arrest him, and required him to surrender. The reasons of this conclusion are so fully and forcibly put in the former opinion, that a repetition of them here would be useless.
I admit the general rule (with one qualification hereafter to be stated) that both an officer and a private person, ought to acquaint the prisoner with the cause of the arrest. But to every general rule there must be exceptions, and in criminal cases this is peculiarly the case. For, as I have often heard the eloquent Judge who tried this case, say, when at the bar, in his able and impressive forensic discourses in favor of criminals, “every criminal case is the law of itself.’” *344 'Crimes mala in se, depend upon intention, and interim ^011 is only to be collected frofti the facts attending the commission of the alledged crimé-, -and hence ev» eiT criminal case is more or less dependent upon its attendant circumstances.
The reason of the rule, is that the prisoner may not act in ignorance that it is by authority or permission of law that he is about to be arrested. If he has this knowledge by other means, it is unnecessary to go through the mere form of stating it to him. 1 Hale’s P. C. 458, 461. 1 Russ, on crimes 737. But to make •the general rule at all applicable, it must appear that some of the prisoner’s rights have been violated. As Where the prisoner’s house is broken open, or there is an attempt to lay hands upon Mm. in such ease, it is .generally necessary that the cause should be assigned. But where, as in this case, it is a mere preparatory arrangement to the arrest, where the prisoner was told that they intended to arrest, but they did not attempt to láy hands upon him, the rule has no application. There was nothing done which authorized him to repel force by force. Indeed, he1 was the aggressor throughout the whole transaction. When he was discovered in his lurking place before any attempt was made ■to cause him to surrender, he presented and snapped Ms pistol at Col. Martin, who then told him, that they were there to arrest him, and left the house. Could this authorize him to kill one of the party? ’Unquestionably not. He might have then Sed from them, and if innocent-, and he had been killed, it would have been at least manslaughter in Col. Martin and his party. 2 Hale’s P. C. 83. But I apprehend that he •had no other immunity, so long as the party desisted from personal violence to him.
At page 83, of his 2d vol. of the Pleas of the Crown, Sir Matthew Hale puts the very case before the Court. “But then suppose, that either before the arrest, or after the arrest, B draws his sword and assaults As and A presseth upon him either to take or detain him¿ and in the conflict, B kills 4*> it is murder in B ; or if A kills B, it is justifiable, and no felony in A.” The *345 reason is, in the first part of the proposition, because, until the actual attempt to lay hands on his person, he could not strike in defence of his person; and in the second, after the arrest was actually made, it was his duty to submit to it. In either branch of the proposition, B is legally the aggressor, and is of course guilty of murder, for he has neither excuse nor justification.
In the case before us, the prisoner from the moment he snapped his pistol at Col. Martin, was so far the aggressor, as to justify ■ them in pressing upon him to take him. He cast off the protection of the law, and put himself without excuse upon the footing of the avowed felon resisting the law at all and every hazard. At the instant the offence was perpetrated, he was again the aggressor. . For from the proof, and the concurring verdicts of two juries, we may conclude, that he removed the board which covered the opening through which he gave and received the fire, and that he was in the act of firing upon Berry, when he anticipated his fire. If this be so, can it, will it be contended, that an acknowledged fugitive felon, has the right to shoot down any citizen who makes one of a party surrounding his place of concealment and retreat? Were this interrogatory to be answered affirmatively, I should think that justice was cruel mockery, and that guilt and innocence could no longer be said to make any distinction before human tribunals.
The qualification to the general rule to which I have alluded, is that where the party making the arrest inform the prisoner of their intention to arrest, or actually make it, and the prisonermakes no demand of the cause, it is not necessary to state it. After Col. Martin informed the prisoner that he and his party were there to arrest him, to avail himself of his want of knowledge of the cause of the intended arrest, he ought to have demanded it. His failing to do so, as well as the facts to which I have already adverted, deprive him of any benefit of this defence.
The ease of Hall against Roche, 8 D. & E. 187, relied on in the argument, urns the case of an arrest iii a *346 civil case before a writ was issued: the arrest was held to be void under the stat. 6. Geo. 1. S. 21. But if that case is authority for any purpose in this case, it is a direct authority against the view taken by the prisoner’s counsel, of this part of his ease. The only thing which touches the point, is an observation made by Lord Kenyon in delivering his opinion. “It is very important that in all cases where an arrest is made by virtue of a warrant, the warrant (if demanded at least) should be produced.” From which it would seem that an officer making an arrest on demand, would be bound to produce his warrant: and putting private persons on the footing of officers in cases where the law allows them to arrest, it would seem that when demanded, they should after the arrest made, or after stating the intention to arrest, also state the cause of arrest.
5. The sixth ground of the prisoner’s motion, supposes that the conduct of Col. Martin and his party in making the arrest, was such reasonable provocation,- as to cause sudden heat and passion in the prisoner, and that therefore his offence is manslaughter. So long as the prisoner was content peaceably to avoid the arrest, I have do doubt that Martin and his party had no right to kill him ; and if they had, it would have been -manslaughter. But the moment he assumed the attitude of hostility, and put in jeopardy the life or limb of any of the party, they would have been justified in killing him. If on the instant he snapped his pistol at Col. Martin, he (Col. M.) had shot the prisoner dead, it would have been excusable homicide. After such an act, when he had possession of the house, and there was no way of approaching him, but at the hazard of life, they might very well resort to every possible means of intimidating and inducing him to surrender peaceably. Like the lion, he was at bay, and in his den, and stratagem in the one case as well as the other, was the most prudent as well as the most excusable mode of conquest. The orders to firé through the house, were given for the purpose of intimidation,- the prisoner might have been alarmed by it, but could have been in no real danger *347 so long as the wall separated him from the party who had surrounded the house. Of his advantage in this respect, he seems to have been fully aware; for after the order to fire through the house, he was told to come out and he should not be hurt; he promised to do so; but instead of complying with his promise, he removed the board, and was in the act of shooting Berry, when he fired upon him. He knew that if he surrendered he was in no personal, dánger; the party were strangers to him, and could not have been suspected by him, to have been acting from motives of revenge to him. There was therefore, not even an imaginary necessity for him to fire upon them for his own preservation. The orders to fire through the house, were not obeyed nor attempted to be obeyed; if they' had been, there might have been more plausibility in this part of the case. He himself exposed his person to the view and the fire of Berry; for the purpose of killing him. The case as it stands, is exactly the same as if he, after the orders to fire through the house, had walked out into the yard, and levelled his pistol upon Berry; in such a case if Berry had killed him; would it have been doubted that it only amounted to excusable homicide se defendiendo', & if he he had killed Berry, that it would have been murder? I apprehend in such a case there could be no doubt; and in the case before us, there can be as little. He, without necessity, was in the act of shooting Berry when he shot him; Berry’s act was justifiable and lawful — his unjustifiable and unlawful; and the degree of his offence, whether murder or manslaughter, depends upon the right of Col. Martin and his, party to arrest him as a fugitive from the justice of the State of Georgia.
6- The seventh ground, brings up again that question, which was fully discussed and decided, on the former-trial in this Court. As an act of justice due to the vilest criminal on earth, and that even the murderer’s blood should not be shed contrary to law, we permitted, the question to be again argued; and as briefly as i can, I shall proceed to assign our reasons for affirming the former decision.
*348 I not propose to goat large into the consideration of the question of international law, which was so well and ably argued by my brother Johnson, at the last Term, (a.) There can be no doubt of the general proposition maintained by him, that between nations wholly foreign to each other and at peace, comity requires thatcriminals fugitive from justice shouldbe delivered to the State or authority from which they fled, on demand. This so far as the rule of national law is concerned, is a comity between the governments, and not the people of each. But as between the govern-sinent into which the criminal flies, and its people, the aright to arrest, is a right necessary to its own preser-Jvation. They have the right to say, we will not be fumade the refuge of the “lawless and vile of other nations they have the right to put within the power of their own government, the exercise of the comity which may be demanded, in placing the criminal in its custody. The question whether the criminal shall be delivered up, is for the government exercising the po *349 litical sovereignty of the people: whether his arrest is lawful, is a question for the judicial department. In treason and felony within the jurisdiction of a State, I the regular mode of arrest is by warrant, but from ne-f cessity as well as sound policy, private persons are* permitted to arrest, where a felony has been commit-j ted, and there are reasonable grounds to suspect the' party arrested to be the felon. In 1 Hale’s Pleas of the Crown, 588, it is said, “if a felony be committed in fact, and A suspects B, and hath probable cause of suspicion, A may arrest B for it, and justify it in an action of false imprisonment.” “The causes of suspicion are many, as commonfame, finding goods upon him, and many more.” If in such a case, arrest upon suspicion can be justified in an action of false imprisonment, the arrest would be lawful for all purposes: and I confess that I have never been able to see any ground why the party suspected, (if he should turn out to be innocent) who kills the party attempting to arrest him, would only be guilty of manslaughter. *350 such is clearly the rule, as is well made out by the of my brother Johnson. Does not the same ¡reason apply in full force, to justify the arrest of a fugi-íive from the justice of a foreign State? He is not entitled as of right, to the protection of the government [to which he has fled, against that from which he flies. [Her protection to him, is at the peril of war with that in which he commits a crime. It is conceded that the government may cause him to be arrested. Why? For the self-same reasons, why criminals are arrested and punished for crimes within her own borders — the prevention of crime, and the security of the peo-pie. There is just as much danger of repetition of crime by the fugitive, as the domestic felon. Good morals require crime to be punished, let its place of perpetration be where it may. The safety of the people in person andproperty, may and does often require his arrest. In such a case, the fugitive may be arrested by warrant, or detained in custody, as is fully proved, by the case of the King v. Hutchison 3 Keb. *351 785; Col. Lundy’s case 2 Vent. 314; the case of the King v. Kimberly, Strange 848: Muir v. Kaye; 4 Taun. 34; Washburn’s case; 4. J. C. R. 106. The People v. Gardner, 2 J. R. 477; The People v. Shenck Ib. 479. This being the case, can it be doubted that a-private citizen may make the arres!, taking upon him-’; self the burthen of shewing that 'the party arrested? is the felon. The reasons of necessity and good pol-t icy exist in this, as well as the cáses of crimes committed within the State’s own borders; and there is just as much propriety in allowing it in the one, as the other. But 1 am disposed to think in an arrest of a fugitive from the justice of a nation wholly foreign to us, that the party arresting ought in every case turning on it, whether civil or criminal, to shew the actual guilt of the party accused and arrested. This affords security against the- abuse of a power founded in necessity.
It was not, perhaps, necessary, that I should have even added these few remarks, to the observations of *352 my brother Johnson, on the question of international law between nations wholly foreign to each other; forth e question as I conceive stands on narrower grounds for the prisoner, as between Georgia and South Carolina.
The 4th Article of the constitution of the United States, 1st and 2nd sections, has provided for the case before us.
The 1st section declares that, “full faith and credit shall be given in each State, to the public acts, records, and judicial proceedings of every other State ; and the Congress may by general laws, prescribe the manner in which such acts, records and proceedings shall be proved, and the effect thereof.” The 2nd section provides, that “the citizens of each State shall be entitled to all the privileges, and immunities of citizens in the several States.”
“A person charged in any State, with treason, felony, or other crime, who shall flee from justice, and be found in another State, shall on demand of the exec- *353 ulive authority of the State from wliich he fled, he delivered up, to be removed to the State having jurisdiction of the crime.” The act of Congress of 1793, passed under the 2d. and3d. clauses of the 2d. section, provides, that upon a demand by the executive authority of a State or Territory, the production of a copy of an indictment found, or an affidavit made before a magistrate of any State or Territory, charging any person with treason, felony or other crime, certified as authentic by the Governor of the said State, that the said person shall be caused to be arrested and delivered up, by the Governor of the State in which he is found.
The 2d. clause of the 2d. section, 4th Article of the Con. of the U. S. constitutes the fundamental law on this subject of all the co-States. It is a part of the municipal law of each, and is to be obeyed, observed and respected by every citizen and officer. It is made an imperative obligation on South Carolina, that Anderson, who was charged with murder in Georgia, should on demand be delivered up.
The States.are foreign to each other in all respects m which their intercourse and duties are not regulated by the constitution of the United States ; but within the constitution, this foreign character ceases. A question arising under the constitution, is not a question of comity between foreign States; but of positive paramount law between co-States, which all executive, judicial, and ministerial officers must observe and enforce.
Take the case before us — could the Governor of South Carolina refuse to deliver the prisoner to the Governor of Georgia, on the requisitions of the act of Congress being complied with? Unquestionably; he could not. Could the Court before which Anderson was tried, if he had been acquitted, have ordered him to be discharged? According to the Constitution, he could not have been discharged, with the evidence before the Court, of the proclamation, and indictment found. He must have been detained urn til information could have been given to the Govern- *354 or of Georgia. The People v. Schenck, 2 John. R. 479. The exercise of national comity, is a discretionary duty, which is with the Government, to perform or not, as to it may seem wise and expedient. A duty arising under the Constitution, is of strict law, in which no public functionary dare exercise any discretion. He is the agent of the people, to execute their business: the Constitution is their direction to him, how it shall he performed; he is sworn to observe, protect and defend it; and he dare not (if he wished it) shrink from its enforcement. The question under the Constitution, is not, is the prisoner at the bar such an offender, as we think ought, on demand, to be delivered up to the State of Georgia? but, is he charged, in that State, with treason, felony, or other crime? If he is, on demand he must be delivered up.
Under the 2d. section of the 4th Article of the Constitution of the United States, the prisoner, on his arriving in this State, was entitled to all the privileges and immunities of our own citizens, subject to one exception, arising out of the second clause of the 2d section — -his liability to be arrested, and sent to Georgia, for trial, for the murder there committed.— This exception, making him liable, in any event, to arrest here, for the purpose of being tried in Georgia, makes the offence in Georgia as good cause for arresting him here, as if it had been committed in South Carolina. The prisoner, when he fled from Georgia, to South Carolina, knew upon what footing he would stand, in the latter; he cannot, therefore, complain of any of his privileges or immunities being violated, if he is arrested for a crime committed in Georgia. He has the immunities and privileges of our citizens, subject to that qualification.
The act of Congress of 1793, has provided one mode, by which the Governor may be required to cause him to be arrested; but it has not undertaken to declare, (and if it had, it would have been unconstitutional) that a fugitive from justice, shall not be arrested in any ¡other mode.
*355 By the common law, all persons guilty of treason, or felony, may be arrested by a private person.— Why? Because the State requires that they should be tried and punished for it, for the prevention of crime, and the security of the people. By the Constitution, she has undertaken that a person charged with treason, felony or other crime in another State, and found within her limits, shall on demand, be delivered up to be removed to the State having jurisdiction of the crime. She thereby makes such a person liable to be arrested within her limits, on the chai-ge made against him in another State. Who is to arrest him? Under the act of Congress, on its provisions being complied with, the Governor is required to order him to be arrested., Is he cqmpelled to wait until a demand is made? As the Governor of the State and representative of the people in their Executive sovereignty, charged with the preservation of the constitution of the United States and the execution of the laws of the State, he might I should think, on receiving information, from any source deserving credit, that a fugitive from the justice mi a sister State, charged with treason, felony or other crime, was within the limits of the State of which he was Governor, issue his proclamation requiring him to be arrested and committed for safe keeping. Be that however as it may, the people through another branch of their government, the judiciary, have the right to take care that the duty of bringing a fugitive felon to justicé, shall not be evaded by the escape of the felon. Whenever any person is liable to be tried for felony, he is ipso facto, liable to be arrested under a warrant issued by any Justice of the peace upon information. The prisoner was liable to be tried in Georgia, and his residence in South Carolina, did not deprive Georgia of'jurisdiction over his person. His process of arrest could not however be executed in South Carolina: to obviate this difficulty, South Carolina bound herself by the Constitution, on demand made to deliver him up. This necessarily implies that the right to arrest him, exists in the State. To secure his deliverv and trial, a Jostice of *356 tíie Peaee> as part of the judicial sovereignty of the State, might on information on oath, issue his warrant and lodge him in gaol for safe keeping, until demanded. Washburn’s case 4 J. C. R. 106, is an instance of a warrant by a Justice of the peace of the State of New York, arrest under it, and commitment, of a fugitive felon from Canada, for safe keeping and delivery, until a demand could be made for him, on the Government of the United States agreeably to the provisions of the treaty with Great Britain. The People v. Shenck, 2 J. R. 479, was the case of a prisoner indicted in New York, for goods stolen in New Jersey; the Court held, that the prisoner was not liable to be pun-uished for the offence in New York, and that he was entitled to be discharged from the prosecution. But the Court remarks, “we think it proper to order that he be detained in prison for three weeks, and in the meantime, let notice be given to the Executive of the State of New Jersey, that the prisoner is detained on a charge of felony committed in that State, and if no application be made for the prisoner within that time, he must be dischrged.” These cases shew that whenever by constitutional law or treaty, a person must on demand be delivered up, that he may be arrested and detained in custody for that purpose, by the ordinary judicial power of the State. The prisoner being liable j'to be arrested, as a fugitive from justice, by warrant, {it follows that a private person from necessity, and 'sound policy (as was demonstrated by my brother I Johnson in the former opinion) may make the arrest, ¡without warrant, on shewing (as he held) that prima \ facie, a felony was in fact committed, and that the pri- | goner was. the perpetrator, I hold, that to justify the (arrest, it is only necessary to shew, that the prisoner is charged in another State with treason, felony or other crime. This I think has been already sufficiently shown to be the correct view. It remains to be examined slightly, what ought to be the evidence that the prisoner is charged with treason, felony or other •prime in another State. The Governor’s proclama *357 tion, andthe indictment found by the Grand Jury, seem to me all the evidence which can, or ought to be required.
. The proclamation of a goverhtnent wholly foreign to us, or any of its judicial proceedings short of actual conviction, would not perhaps be even prima facie evidence of the prisoner’s guilt. They are not as matter of right, entitled to full faith and credit here, and it follows that all proceedings short of final judgment could be evidence of no fact, except that such proceedings had taken place in a foreign Court. We are not judicially bound to receive them in evidence as verifying themselves, en being exemplified. For according to Starlde, proof of the signature of the Judge, ■without proof of the seal of the Court, would not be sufficient evidence of a foreign judgment. 1. Stark, on Ev. 252. The general rule in relation to the admission of foreign judgments in evidence, is that they must be proved like other writings. Delafield v. Hand 3, J. R. 310.
The 1st. section of the 4th Art. of the Con. of the U. S. declares that “full faith and credit shall be given in each State to the public acts, records, and judicial proceedings of every other State.” To give the public acts, records and judicial proceedings of the State of Georgia, full faith and credit in this State, they must here be held to have the same effect as instruments of evidence, which they would have had there. The finding by the Grand Jury ofthe indictment, a true bill, is within the jurisdiction of Georgia, mima facie evidence Of the guilt of the prisoner ; and it is itself the charge of felony there, to which he is bound to answer. In S outlr C ar olina, when given in evidence by a copy exemplified according to the act of Congress, it in pri-ma facie evidence ofthe prisoner’s guilt, and it is also evidence, that he is charged in Georgia with the crime of murder. The proclamation of the Governor of Georgia is, within that State, sufficient authority for the arrest of the prisoner out of Georgia- — and in any of the other States, it ceases to be an instrument of authority justifying an arrest under it, but it is evi *358 dence °f facts stated in it, to wit, that the prisoner *s charged with the murder of Goodson, and that he has fled from justice- It is also evidence of another facb that the government ofGeorgia desires the apprehension of the prisoner; and the inference from it is irresistible, that the Governor of Georgia will demand him. The proclamation certainly constituted reasonable grounds to believe, that the prisoner was a fugitive from the justice of the State of Georgia, charged with murder, and was sufficient to have justified an information on oath to have been made by any one, according to his knowledge and belief, that the prisoner was such fugitive from justice. Upon such information, a warrant might have been issued; and it follows that upon the same grounds, a private person might have arrested, taking upon himself the burthen of shewing the legal existence of the proclamation, and of the charge of murder againstthe prisoner, by an indictment found. This was done on this, and the former trial, accompanied by the proof of the prisoner’s identity, and that he was found and arrested in South Carolina; fully establishing, according to my view of the law, the legality of the attempt to arrest.
But whether this was alone necessary, or whether proof of even the prisoner’s actual guilt in Georgia, was also necessary, is now perfectly immaterial. The proof meets and answers both views of the case.
Motion for new trial dismissed,.
Johnson & Harper. Js. concurred.